UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Brent LaBombard,
    Plaintiff,

    v.                                       Civil Action No. 2:09-CV-136

Delores Burroughs-Biron,
Jeffrey C. Cobb, Judy Roberts,
Jacqueline M. Johnson, Unknown
Medical Staff at Chittenden
Regional Correctional Facility,
Unknown Medical Staff at Southern
State Correctional Facility,
    Defendants.

## **CORRECTED REPORT AND RECOMMENDATION**
(Docs. 9, 20, 21 and 24)

      Plaintiff Brent LaBombard, a Vermont inmate proceeding *pro se*, brings this action claiming deliberate indifference to his medical needs in violation of the Eighth Amendment. LaBombard alleges that he contracted the "MRSA virus" while in prison, and that his condition was either ignored or misdiagnosed on two occasions. In both instances, he allegedly required hospitalization and strong antibiotic treatments in order to reverse his illness.

      Currently before the Court is the defendants' motion to dismiss. In support of their motion, the defendants argue that they are immune from suit in their official capacities, that certain defendants were not personally involved in LaBombard's medical care, and that LaBombard failed to exhaust the prison grievance procedure before bringing his claims.

1

LaBombard has responded to the motion, and asks the Court to convert it to a motion for partial summary judgment on the question of administrative exhaustion.

For the reasons set forth below, I recommend the motion to dismiss be converted to a motion for summary judgment, and that LaBombard's claims be DISMISSED without prejudice for failure to exhaust his administrative remedies.

## **Factual Background**

According to the allegations in the complaint, LaBombard contracted the MRSA virus while in the custody of the Vermont Department of Corrections ("DOC") and incarcerated at the Southern State Correctional Facility ("SSCF"). When he first complained of his illness, he was allegedly denied medical attention by Correctional Officer Jacqueline Johnson. It is not clear from the complaint how sick LaBombard was when Officer Johnson denied him medical care, but LaBombard claims that at some point his "face was swollen to where plaintiff was unable to see from one of my eyes and my upper lip was huge." (Doc. 5 at 6.)

LaBombard was eventually taken to the prison medical unit and provided an antibiotic. The treatment, however, was ineffective due to an alleged misdiagnosis, and LaBombard continued to suffer. He claims that his complaints of pain were ignored, and were even met with threats of disciplinary action.

LaBombard was subsequently seen by prison Superintendent Ellen McWard, who ordered that he "go to Medical" because his infection was at the point where he "was engulfed with sores that were oozing pus from them." *Id.* While at the medical

department, LaBombard was placed under strict supervision and was not allowed to leave the unit. Even while in the medical unit, however, LaBombard claims that he was not provided proper treatment. Again, it allegedly took an order from the Superintendent before he was transferred, this time to the local hospital.

LaBombard claims that while in the hospital, he received "the strongest antibiotic." He states in his complaint that "[i]t was learned later that the plaintiff would have been dead if not treated at that time for the infection where the plaintiff's entire body had the MRSA in his blood stream, and was very much closer to death as depicted by the doctor." *Id.* at 7.

Once he recovered, LaBombard was transferred to the Chittenden Regional Correctional Facility ("CRCF"). While at CRCF, he again showed symptoms of the MRSA virus. LaBombard complained to the Correctional Officer in his unit, who in turn contacted the Shift Supervisor. LaBombard claims that Shift Supervisor Jeffrey Cobb made no attempt to see him, and failed to order proper medical care.

At "some point" later, LaBombard was placed in segregation and quarantined because of his infection. *Id.* A New York State Trooper subsequently arrived at CRCF to escort him to New York pursuant to a warrant on felony charges. When the Trooper saw him, however, he questioned whether LaBombard was "alright to be released to New York" and was allegedly told by medical staff that "it was nothing to worry [about]." *Id.* When LaBombard informed the Trooper that he had the MRSA virus, the Trooper called New York and was told that LaBombard would not be accepted into a prison facility until

3

he had recovered.

LaBombard was later transported to "the Burlington Medical Center" for treatment of his infection. "[I]t was determined that the infection was so engrossed in the plaintiff's system that he was placed on the highest antibiotic to get rid of the infection once more." *Id.* at 8. LaBombard was also allegedly informed by medical personnel at the hospital that he could have been treated, and cured, sooner.

LaBombard now asserts that the defendants violated his constitutional rights when they ignored his claims of pain and failed to provide timely and appropriate medical treatment. For relief, he asks the Court to order the DOC to issue "an Internal Memo" requiring all correctional facilities to provide training in identifying the MRSA virus, and to issue generally "stricter rules in the training, proper officer supervision of the inmates" at DOC facilities. *Id.* at 10. He also seeks compensatory and punitive damages.

## Discussion

### I. Conversion To Summary Judgment

The defendants have moved to dismiss the complaint on several grounds, including LaBombard's alleged failure to exhaust the prison grievance procedure. LaBombard responds that he tried to file grievances, but was twice refused grievance forms while in quarantine. Both sides have submitted affidavits in support of their positions.

When a motion to dismiss is premised on the plaintiff's failure to exhaust his administrative remedies, the first question is whether non-exhaustion is clear from the face of the complaint. Because exhaustion is an affirmative defense, an inmate is not required

4

to plead or demonstrate it in his complaint. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Nonetheless, if the complaint plainly shows that administrative remedies were not exhausted, the motion to dismiss should be granted. *See McCoy v. Goord*, 255 F. Supp. 2d 233, 251 (S.D.N.Y. 2003)).

If the complaint does not clearly demonstrate a lack of exhaustion, a court may convert the motion to one for summary judgment "limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *Id.* Federal Rule of Civil Procedure 12(d) provides that if a court undertakes such a conversion, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Accordingly, a district court must ordinarily give notice to the parties before converting a motion to dismiss into a motion for summary judgment. *See Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009). However, in some cases a party "is deemed to have notice that a motion may be converted . . . if that party should reasonably have recognized the possibility that such a conversion would occur." *Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004) (citation omitted).

Here, LaBombard has asked the Court to convert the defendants' motion to dismiss to a motion for summary judgment. He has also waived notice of the conversion process, and has asked the Court to review his affidavit and statement of disputed material facts. (Doc. 19 at 7.) The defendants have not opposed the motion for conversion, and have

5

provided their own affidavits on the exhaustion issue. The Court should therefore find that all parties have been given a reasonable opportunity to present their materials, and that special notice is not required. Moreover, because exhaustion cannot be determined from face of the complaint, the Court should convert the motion to dismiss to a motion for summary judgment on that issue.

## II. Summary Judgment Standard

"Summary judgment is appropriate when the pleadings and admissible evidence proffered to the district court show that there is 'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). "[T]he moving party bears the burden of demonstrating the absence of a genuine issue of material fact." *Baisch v. Gallina*, 346 F.3d 366, 371-72 (2d Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In considering a motion for summary judgment, the Court construes the facts "in the light most favorable to the nonmoving party," and draws "all reasonable inferences in its favor." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).

## III. Exhaustion

The Prison Litigation Reform Act ("PLRA") requires that "no action [ ] be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). In other

words, when a prison offers a grievance procedure, a plaintiff must fully comply with that procedure and, if initially unsuccessful, appeal through to the highest level of administrative review. *See* 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 93, 95 (2006); *Booth v. Churner*, 532 U.S. 731, 735 (2001).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones*, 549 U.S. at 211. The Supreme Court has held that "the benefits of exhaustion . . . include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219.

The "boundaries of proper exhaustion" are defined by the grievance requirements at the prison. *Id.* at 218. In Vermont, the DOC's grievance procedure allows an inmate to first lodge an informal complaint, either orally or in writing. (Doc. 9-3 at 6.) If the situation is not resolved to the inmate's satisfaction within 48 hours, *id.* at 7, he may begin the formal grievance process. That process requires a DOC staff member to investigate and recommend a resolution to a supervisor. If the supervisor agrees, the resolution is reported to the inmate, who may then appeal to the facility superintendent if still not satisfied. (Doc. 9-1 at 1.) According to an affidavit submitted by John Murphy, the DOC's Grievance Coordinator, "[t]he facility superintendent may support the resolution, modify it, or reject it. If the superintendent's reply is not satisfactory to the inmate, additional levels of appeal are available that eventually reach the Commissioner. The

7

Commissioner is the final arbiter of inmate grievances." *Id.*

In his complaint, LaBombard concedes that the DOC has a grievance system, and that he did not exhaust his remedies under that system. (Doc. 5 at 3.) The Murphy affidavit confirms that no formal grievance was ever filed. (Doc. 9-1 at 2.) LaBombard also claims, however, that he tried to exhaust the grievance process on two separate occasions but was prevented from doing so by DOC staff.

Specifically, LaBombard alleges that in 2007, while suffering from the MRSA virus at SSCF, he was placed in quarantine for two to three weeks. During that time, he was not allowed to use the phone, send letters, or have contact with anyone outside his room. Concerned about his medical treatment, he asked to file a grievance but was told that he "could not have one because [he] was under quarantine and **<u>NOTHING</u>** was allowed to leave [his] room." (Doc. 19-1 at 2) (emphasis in original). As discussed above, LaBombard was subsequently transferred to a hospital, where he spent four weeks receiving IV antibiotics before being returned to SSCF. *Id.*

When he subsequently became sick at CRCF, LaBombard was again placed on "quarantine status" and allegedly denied a grievance form because "**<u>NOTHING</u>** was allowed to go in or out of [his] room, including grievances." *Id.* at 3 (emphasis in original). He spent approximately three weeks in quarantine, followed by another three weeks at the hospital. Shortly after his return to CRCF, he was extradited to New York. *Id.* at 4. The Court's docket indicates that LaBombard is currently in the custody of the

Vermont DOC, and has been since he filed his complaint in June 2009.[1]

The defendants do not challenge LaBombard's claim that he was denied grievance forms. Instead, they argue that although a grievance form was not made available to him while he was in quarantine, LaBombard could have filed a grievance thereafter. Attached to their reply memorandum are three affidavits of DOC staff, establishing that LaBombard was advised of the DOC grievance process on several occasions in 2007 and 2008 and that he acknowledged his awareness of that process. (Docs. 22-1, 22-2 and 22-3.) The affidavits also state that while being advised of the grievance process, LaBombard "was free to file a grievance over the medical care that he received while an inmate in the custody of the Vermont Department of Corrections." (Doc. 22-1 at 2); (*see* Doc. 22-2 at 1.) Finally, although not supported by an affidavit, the defendants assert in their reply memorandum that the denial of grievance forms "was premised on legitimate medical concerns." (Doc. 22 at 2.)

The Second Circuit has held that three circumstances may excuse a plaintiff from the PLRA's exhaustion requirement: (1) when administrative remedies are not available; (2) when defendants have either waived this defense or acted so as to estop them from raising the defense; or (3) when special circumstances, such as a reasonable misunderstanding of the grievance procedures, otherwise justify the prisoner's failure to comply with the exhaustion requirement. *Ruggiero v. County of Orange*, 467 F.3d 170,

---

[1] LaBombard is being housed out of state pursuant to a contract between the DOC and a private prison company. *See Bain v. Hofmann*, 2009 WL 959978, at *1 (D. Vt. Apr. 3, 2009).

175-76 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). Since the Second Circuit's development of these exceptions, the Supreme Court has held that the PLRA requires "proper" exhaustion as a prerequisite to filing a § 1983 action in federal court. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "It is unclear whether *Woodford* has overruled any decisions that recognize 'exceptions' to the exhaustion requirement." *Murray v. Palmer*, 2010 WL 1235591, at *3 n.7 (N.D.N.Y. March 31, 2010).

If *Woodford* eradicated the Second Circuit's exceptions to the PLRA's exhaustion rule, LaBombard's claims in this Court cannot proceed. Even assuming, however, that the exceptions set forth by the Second Circuit are still good law, the undisputed facts establish that, as a matter of law, LaBombard failed to exhaust the DOC's grievance procedure. *See Ruggiero*, 467 F.3d at 176 ("We need not determine what effect *Woodford* has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre-*Woodford* case law."). Consequently, his claims should not be allowed to proceed.

Under the Second Circuit's analysis, the first question is whether the DOC's grievance process was "available." *Hemphill*, 380 F.3d at 686. To be available for purposes of the PLRA, an administrative remedy must afford "the possibility of some relief for the action complained of." *Booth*, 532 U.S. at 738. "The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Hemphill* 380 F.3d at 688 (internal quotation marks and citation omitted).

10

There is no dispute that the DOC has a grievance procedure in place, and that the procedure existed while LaBombard was incarcerated. Given the existence of the grievance procedure, the question turns to whether LaBombard was either unaware of the procedure, *Ruggiero*, 467 F.3d at 179, or whether the defendants' behavior prevented him from accessing it. *Hemphill*, 380 F.3d at 686. The defendants' affidavits, and LaBombard's own request to commence the grievance procedure, show that he was aware of the existence of a grievance system. The Court must therefore determine whether the defendants' refusal to provide him with grievance forms during his time in medical quarantine rendered the grievance process unavailable, and estops the defendants from asserting the defense of non-exhaustion.[2]

The alleged conduct of DOC employees in this case was limited to a unique medical situation. Specifically, the prisoner was placed in quarantine, presumably because of the nature of his illness and the threat of further infection to himself and/or others. Even when viewing the facts in a light most favorable to the plaintiff, the fact that he was denied grievance forms while in quarantine does not demonstrate either bad faith conduct on the part of the DOC, or a systematic denial of access to the grievance system. Instead, it indicates a temporary deprivation of access to the formal grievance process, quite possibly due to medical necessity.

---

[2] As one court in this Circuit noted, "[c]ase law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies 'unavailable' to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses." *Hargrove v. Riley*, 2007 WL 389003, at *8 n.14 (E.D.N.Y. Jan. 31, 2007).

The defendants properly argue that LaBombard could have availed himself of the grievance process after his release from quarantine. LaBombard counters that because the process was not immediately available, it was not a viable remedy and his lack of exhaustion should be excused. In *Ruggiero*, the Second Circuit noted that "so long as some remedy remains available, failure to exhaust is not excused." 467 F.3d at 177. This principle applies, for example, when "a formal grievance still would have allowed prison officials to reconsider their policies [regarding the treatment of the MRSA virus] and discipline any officer who had failed to follow existing policies." *Id.* Indeed, the relief sought by LaBombard in the instant case includes additional training of DOC staff in identifying the MRSA virus, and "stricter rules in the training, proper officer supervision of the inmates at each of the Correctional Facilities under the department's control." (Doc. 5 at 10.)

Furthermore, the conduct of DOC personnel in this case had little in common with cases wherein courts have estopped defendants from asserting a lack of exhaustion. For example, in *Sandlin v. Poole*, 575 F. Supp. 2d 484, 487-88 (W.D.N.Y. Sept. 8, 2008), Correctional Officers failed to provide grievance deposit boxes, refused to accept grievance forms, refused to forward forms to the appropriate offices, and at times denied inmates access to either grievance forms or writing paper. The officers engaged in these practices were often the same officers against whom the grievances were brought. *Sandlin*, 575 F. Supp. 2d at 487. The district court held that this "combination of circumstances" effectively rendered the grievance procedure unavailable. *Id.* at 488; *see*

*also Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir. 2004) (defendant may be estopped from asserting a non-exhaustion defense if evidence supports plaintiff's claims of beatings, threats, denial of grievance forms and writing tools).

LaBombard also cites *Scott v. Gardner*, 287 F. Supp. 2d 477, 491 (S.D.N.Y. 2003) for the proposition that "[i]f an inmate is not allowed to file a grievance by prison authorities, a question exists as to whether . . . he had any available administrative remedies." In *Scott*, however, the plaintiff was told that he could not file a grievance with regard to conduct that occurred in his previous prison facility, and he submitted evidence showing that "DOCS routinely prevents inmates from filing grievances at [] different facilities from where the conduct occurred." 287 F. Supp. 2d at 491.

Here, LaBombard was denied a grievance form because of his quarantine status. He does not claim to have been denied access to the grievance system when not in quarantine, and the defendants' affidavits make clear that he was advised of, and given access to, the grievance system on several specific occasions during his incarceration. Accordingly, unlike the systematic denials evidenced in *Sandlin* and *Gardner*, the facts in this case do not excuse LaBombard's failure to exhaust.

LaBombard argues that his other attempts to complain about his medical situation, such as filing sick call slips and directly complaining to Correctional Officers, should qualify as initiating the grievance process. (Doc. 23 at 3.) This argument fails in two respects. First, courts have held that such efforts, standing alone, do not qualify as exhaustion under the PLRA. *See, e.g., Hargrove v. Riley*, 2007 WL 389003, at *7

13

(E.D.N.Y. Jan. 31, 2007) (holding that letters to County Sheriff and sick call slips did not exhaust County correctional facility's grievance procedure); *Williams v. Metro. Det. Ctr.*, 418 F. Supp. 2d 96, 101 (E.D.N.Y. 2005) (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with warden and medical staff did not satisfy requirements of PLRA, plaintiff failed to exhaust).

Second, even assuming that these efforts "constituted a 'verbal informal complaint'" as LaBombard suggests, (Doc. 23 at 3), the lack of a response did not excuse him from moving to the next step in the process, and eventually appealing to the Commissioner if necessary, prior to filing suit. *See Clarke v. Thornton*, 515 F. Supp. 2d 435, 440 (S.D.N.Y. 2007); *George v. Morrison*, 2007 WL 1686321, at *3 (S.D.N.Y. June 11, 2007) ("even when an inmate files a grievance and receives no response, he must nevertheless properly exhaust all appeals before his grievance is considered exhausted"). In *Clarke*, the court specifically held that "[a] correctional facility's failure to make forms . . . 'available' to the prisoner does not relieve the inmate from this burden [of exhaustion]." 515 F. Supp. 2d at 439. Instead, the inmate must make "reasonable efforts" in form of a "serious effort . . . to appeal through the proper statutory channels." *Id.* While out of quarantine, LaBombard failed to meet his burden of reasonable efforts and, instead, came straight to federal court.

The record before the Court suggests that LaBombard has been contemplating legal action since at least the summer of 2008, when he contacted the Records Department at Fletcher Allen Health Care in Burlington, Vermont and requested copies of medical

14

records pertaining to his treatment for MRSA in 2007. (Doc. 5-2 at 1.) Also, in November 2007 he asked the DOC if he could review his medical records. *Id.* at 4. During this time, he did not execute his obligations as required by the PLRA.

As noted above, one of the goals of the PLRA is to eliminate unwarranted interference with the administration of prisons by federal courts, and thus "'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Woodford*, 548 U.S. at 93 (quoting *Porter v. Nussle*, 534 U.S. 516, 525 (2002)). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero*, 467 F.3d at 177-78. Notwithstanding his temporary inability to access a grievance form while in medical quarantine, LaBombard's failure to comply with the DOC's "critical procedural rules" frustrated these fundamental policy goals. *Woodford*, 548 U.S. at 95. I therefore recommend that the Court find, as a matter of law, that LaBombard's complaint must be DISMISSED for failure to exhaust his administrative remedies.

## Conclusion

For the reasons set forth above, I recommend that LaBombard's motion for conversion of the defendant's motion to dismiss to a motion for summary judgment (Doc. 20) be GRANTED, and that the defendants' motion (Doc. 9) be GRANTED. LaBombard's motion for leave to amend his Complaint (Doc. 21) to re-plead the

15

defendants' personal involvement is DENIED as moot,[3] and the defendants' motion to strike LaBombard's surreply (Doc. 24) is DENIED. Because LaBombard has failed to exhaust his administrative remedies, the case should be DISMISSED without prejudice.

Dated at Burlington, in the District of Vermont, this 30th day of April, 2010.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* Local Rules 72(a), 72(c), 73; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(d).

---

[3] LaBombard's proposed amended complaint seeks to add Prison Health Services, Inc. ("PHS") as a defendant. (Doc. 21-1.) The claims brought against PHS are for "constitutional violations," and the complaint alleges that all defendants named therein acted under the color of state law for purposes of § 1983 liability.

LaBombard's identification of PHS as a state actor subject to liability under § 1983 is correct. Although PHS is a private company, it assumed the DOC's constitutional obligation to provide medical care to Vermont prisoners, and may thus be held liable for constitutional violations. *See West v. Atkins*, 487 U.S. 42, 54 (1988) (holding that physician is considered state actor when he is under contract to provide medical services to prisoners); *Ford v. Prison Health Services*, 1991 WL 137022, at *1 (E.D. Pa. July 17, 1991) (holding that physician working for PHS was state actor). Furthermore, the PLRA's exhaustion requirement would apply to any claim against PHS. *See Baker v. Allen*, 2006 WL 2226351, at *6 (D.N.J. Aug. 3, 2006).